UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
                                          :
In Re: OLD CARCO LLC (f/k/a CHRYSLER LLC) :
et al.,                                   :
                          Debtor.         :      11 Civ. 5039 (DLC)
                                          :
------------------------------------------:      OPINION AND ORDER
                                          :
THE LIQUIDATION TRUST,                    :
                          Appellant,      :
                                          :
              -v-                         :
                                          :
DAIMLER AG, et al.,                       :
                          Appellees.      :
                                          :
------------------------------------------X

APPEARANCES:

For the appellant:
Stephen D. Susman
Edgar Sargent
Susman Godfrey LLP
560 Madison Avenue
New York, NY 10022

For the appellees:
Alan Steven Goudiss
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022


DENISE COTE, District Judge:

     In this adversary proceeding, appellant the Liquidation

Trust ("Trust"), successor in interest to the Official Committee

of Unsecured Creditors ("Creditors' Committee") of Old CarCo LLC

f/k/a Chrysler LLC ("CarCo"), alleges that the appellees,

Daimler AG, Daimler North America Corporation ("DNAC"), and

Daimler Investments US Corporation ("DC Holding," and collectively with Daimler AG and DNAC, "Daimler"), stripped away valuable assets from CarCo prior to a complex restructuring that resulted in the sale of CarCo and other Chrysler entities to Cerberus Capital Management LP ("Cerberus").  The Trust therefore seeks to recover, as a constructive fraudulent conveyance, the value of the transferred assets that exceeds the value received by CarCo as part of the restructuring and sale transaction ("Chrysler Reorganization and Sale").

In an opinion dated May 12, 2011, Chief Judge Arthur J. Gonzalez of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granted Daimler's motion to dismiss the Second Amended Complaint ("SAC").  In re Old CarCo LLC, 454 B.R. 38 (Bankr. S.D.N.Y. 2011) ("Bankruptcy Court Opinion").  The Trust appeals the Bankruptcy Court Opinion.  For the following reasons, the Bankruptcy Court Opinion is affirmed.


BACKGROUND

The following facts, which are undisputed unless otherwise indicated, are taken from the SAC, the record on appeal, and the Bankruptcy Court Opinion.  Only those facts relevant to the issues on appeal are discussed below.

I.   The Reorganization of the Chrysler Companies

In 1998, Daimler AG acquired 100% of the equity of Chrysler Corporation, the predecessor in interest to debtor CarCo.[1]  The operations of the Chrysler Corporation were then combined with the operations of other Daimler AG-owned brands and integrated within single subsidiaries.  In late 2006, Daimler AG decided to sell the operations previously acquired in its purchase of the Chrysler Corporation (the "Chrysler Companies").

The Chrysler Companies had two main components.  The first, its manufacturing and sales business, consisted of CarCo and DaimlerChrysler Motors Corporation ("Motors") (together with CarCo, "Automotive").  The second component was its financial services business, including DaimlerChrysler Financial Services Americas LLC and DaimlerChrysler Financial Services Canada Inc. (collectively, "FinCo").  CarCo was a subsidiary of Motors, and FinCo, in turn, was a subsidiary of CarCo.  FinCo provided financing for Chrysler dealerships and retail customer purchases and leases of Chrysler vehicles.  Motors managed the distribution and sale of Chrysler vehicles manufactured by CarCo.  Among other things, Motors purchased Chrysler vehicles and parts from CarCo and sold these vehicles and parts to Chrysler dealers.  Motors also handled warranty administration,

---

[1]     Daimler AG is a stock corporation organized under the laws of the Federal Republic of Germany.  DNAC and DC Holding are direct wholly owned subsidiaries of Daimler AG.

3

claims management on service contracts, and vehicle inspections. The separation of the two companies allowed the enterprise to shift the assessment of taxable income for sales and marketing services to states with lower income tax rates.  The relationship between Motors and CarCo was governed by a Sales and Distribution Agreement (the "SDA") that either company could terminate upon six months' notice.  Each company recorded the revenue and costs from the SDA as a trade receivable or payable on its respective books.  By December 31, 2006, CarCo owed Motors approximately $11.6 billion under the SDA.

Pursuing its decision to sell the Chrysler Companies, Daimler AG hired JPMorgan Chase ("JPMorgan") and Ernst & Young LLP ("E&Y") to create a restructuring plan.  This restructuring plan would separate the Daimler and Chrysler operations and spin off FinCo, the most valuable part of the Chrysler Companies. The ultimate goal of the restructuring plan, which involved only corporations wholly-owned by Daimler AG, was to allow Daimler AG to obtain the best price for its interest in the Chrysler Companies.  A higher price would result from ensuring that FinCo's assets were not available to CarCo's creditors.

Daimler executed the restructuring plan in the spring and summer of 2007.  As a result of the restructuring, FinCo became a stand-alone entity and was transferred from CarCo to a newly formed holding company, DaimlerChrysler Holding LLC ("Holding").

4

Daimler AG caused DC Holding to create Holding in order to provide a vehicle through which Daimler could sell a controlling interest in the Chrysler Companies, including FinCo.[2]  Holding also became CarCo's parent, thereby converting the relationship between CarCo and FinCo from that of parent and subsidiary to that of sister companies under common ownership.  The restructuring also involved the transfer of other assets from CarCo to companies controlled by Daimler AG.  As consideration for the transfer of FinCo and these other assets, CarCo received all of the stock of Motors, as well as another entity, and a note from FinCo for $1.225 billion.  Therefore, as a result of the restructuring, Holding was the direct or indirect holder of the equity interests of the various Chrysler Companies, including CarCo, FinCo, and Motors.

Daimler AG retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") to value the consideration exchanged in the step of the reorganization plan involving the transfer of FinCo.  In its valuation opinion, Houlihan Lokey valued FinCo and the related assets transferred by CarCo to Holding at $7.95 billion.  With respect to the assets

---

[2]     By moving the Chrysler operations into Holding, a purchaser could acquire the Chrysler operations by acquiring that single holding company.  Holding remained wholly owned and controlled by Daimler until the August 3, 2007 closing of the Cerberus transaction, pursuant to which Daimler sold the majority interest in Holding to Cerberus.

transferred to CarCo in that step of the restructuring plan, Houlihan Lokey valued Motors at $5.5 billion.  CarCo also received a $1.225 billion note, which, added to the value assigned to Motors, totaled assets worth $6.725 billion. Therefore, on the face of this valuation opinion, there was a $1.225 billion "gap" between the assets transferred from CarCo and the consideration it was given.

II.  Sale of the Chrysler Companies

Beginning around December 2006, Daimler AG initiated efforts to solicit offers for the sale of Automotive (CarCo and Motors) and FinCo.  CG Investor, LLC, an affiliate of Cerberus (which will also be referred to as "Cerberus") placed the highest bid.  Certain Daimler entities executed an agreement (the "Contribution Agreement") with Cerberus to effectuate the sale of the Chrysler Companies.  Daimler AG also executed the Contribution Agreement as guarantor of the performance of various Daimler entities that were participants to the Contribution Agreement.  The fulfillment of all of the restructuring steps was a condition precedent to Cerberus's obligation to close on the Contribution Agreement.  The Contribution Agreement closed on August 3, 2007.

Pursuant to the Contribution Agreement, Cerberus acquired 80.1% of the equity of Holding and, therefore, an indirect equity interest of an equal amount in the Chrysler Companies.

6

Daimler's equity interest was diluted to 19.9%.  In exchange, Cerberus made an equity contribution to the Chrysler Companies of $7.2 billion.  Of this amount, $1.212 billion was transferred through Holding to DC Holding for certain expenses incurred in connection with the Cerberus transaction; $3.45 billion was contributed to CarCo as equity ("Equity Contribution"); and $2.275 billion was contributed to FinCo as equity.  FinCo used $1.243 billion of this contribution to pay the principal and interest on the note that it had previously issued to CarCo.

CarCo also received other elements of value in the Chrysler Reorganization and Sale.  Cerberus obtained $12 billion in new debt financing for CarCo as consideration (the "Credit Facilities").  The Credit Facilities consisted of $10 billion from large commercial and investment banks, a $1.5 billion loan from an affiliate of Daimler, and a $0.5 billion loan from Cerberus.  The receipt of new debt financing was also a condition to Cerberus's obligation to close on the Contribution Agreement.  Other value received by CarCo included the cancellation by Daimler of approximately $2.7 billion (net) in intercompany debt; the direct repayment in cash of $920 million of intercompany debt by Daimler to CarCo (the "Daimler Debt Repayment"); the assignment of a $500 million tax refund; a $1 billion guarantee of CarCo's pension obligations (the "Daimler Pension Guarantee"); overseas distribution facilities, or

National Sales Centers ("NSCs") that had been previously owned
by Daimler; and 49 ancillary agreements, including joint
development, intellectual property, information technology,
supply and transition agreements, governing Daimler and CarCo's
continuing operational relationship following the Chrysler
Reorganization and Sale ("Ancillary Agreements").

III. Summary of Exchanged Assets

As a result of the combined steps of the Chrysler
Reorganization and Sale, it is undisputed, or the parties do not
challenge for the purposes of this appeal, that CarCo
transferred the following assets: the equity of FinCo, with a
value of $7.95 billion; DC Vehiculos Commerciales/DC
Tractocamiones ("Newco Truck"), with a value of $548 million; DC
Financial Services Mexico ("Newco Services"), with a value of
$383 million; and Chrysler's Auburn Hills Headquarters, with a
value of $700 million.  The total value of these assets
(collectively, the "Transferred Assets") was $9.581 billion.

In consideration for these transfers, as a result of the
combined steps of the Chrysler Reorganization and Sale, it is
undisputed, or the parties do not challenge for the purposes of
this appeal, that CarCo was given, at least[3]: a $3.45 billion

---

[3]    As discussed below, Daimler argues that the Trust fails to
name or ascribe value to various other assets that CarCo
received as part of the Chrysler Reorganization and Sale.  These
assets are not listed here.

cash contribution from Cerberus; a note from FinCo valued at $1.225 billion; debt forgiveness from Daimler totaling $2.036 billion; 100% of the equity of Motors, with a value of at least $450 million;[4] tax indemnification worth $400 million; and a payment for the Auburn Hills Headquarters of $325 million.  The total value of this consideration (collectively, "CarCo's Consideration") was $7.886 billion.  Therefore, for the purposes of this appeal, the maximum "gap" between the assets CarCo transferred and the consideration it received was $1.695 billion (the "Consideration Gap").

IV.  Procedural History

On April 30, 2009, CarCo and certain of its subsidiaries, including Motors, filed for protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  This adversary proceeding commenced on August 17, 2009.  The Creditors' Committee was permitted to take discovery pursuant to Fed. R. Bankr. P. 2004 from Daimler, E&Y, JPMorgan and Houlihan Lokey.  On January 4, 2010 the Creditors' Committee filed an amended complaint (the "FAC"), and Daimler filed a motion to dismiss the FAC on March 5.  On April 23, the Bankruptcy Court issued an order confirming the Second Amended Joint Plan of

---

[4]     As discussed below, the value of Motors is one of the chief issues in dispute in this appeal.  But neither party disputes for the purposes of this appeal that the consideration CarCo received in being given Motors was at least $450 million.

Liquidation ("Debtors' Plan").  The Debtors' Plan became

effective on April 30.  Pursuant to the Debtors' Plan, the Trust

was formed.  On May 5, the Bankruptcy Court issued an order

substituting the Trust as plaintiff, in accordance with the

terms of the Debtors' Plan.

     In the July 27, 2010 opinion which set forth the basis for

the Bankruptcy Court's August 3 dismissal of the FAC, the

Bankruptcy Court concluded that the two parts of the Chrysler

Reorganization and Sale -- the restructuring of the Chrysler

Companies, and Daimler's ultimate sale of a controlling interest

in the Chrysler Companies -- comprised one integrated

transaction.  Liquidation Trust v. Daimler AG, et al. (In re Old

CarCo), 435 B.R. 169, 183-85 (Bankr. S.D.N.Y. 2010).

Accordingly, the Bankruptcy Court concluded that the Trust's

challenges to isolated elements of the restructuring could not

state a claim for constructive fraudulent transfer.  Id. at 187.

Instead, the challenged transfers could only be properly valued

in the context of the entire Chrysler Reorganization and Sale,

including Cerberus's cash infusion into CarCo and other

consideration conveyed to CarCo.  Id.  The Bankruptcy Court

therefore afforded the Trust the opportunity to replead certain

claims, but cautioned that, in any amended complaint, the Trust

should "address the deficiencies in its allegations concerning

the consideration that CarCo received in the single integrated

transaction, including amplification as to all the assets received, as well as to clarify its position concerning the valuation of assets, both for the assessment of the consideration received in the integrated transaction and the insolvency analysis." Id. at 190.

On September 27, the Trust filed the SAC, alleging that even considering the entirety of the Chrysler Reorganization and Sale, CarCo's Consideration was not as valuable as the Transferred Assets.  Although the Trust attributed some value to certain elements of CarCo's Consideration to which it had not ascribed any value in the FAC, it alleged in the SAC that the shortfall in value was still $1.695 billion.  Therefore, as in the FAC, the Trust asserted claims for constructive fraudulent transfer.  The Trust also alleged an unjust enrichment claim against Daimler AG and that Daimler AG should be held liable under an alter ego theory for any liabilities ascribed to the other Daimler defendants.

On November 16, 2010, Daimler filed a motion to dismiss the SAC, arguing that the Trust had not plausibly alleged that CarCo did not receive reasonably equivalent value and fair consideration because the Trust both undervalued certain elements of CarCo's Consideration and did not even account in the SAC for other elements of CarCo's Consideration.  Daimler also contended that the insolvency analysis in the SAC was

flawed.  The Bankruptcy Court held a hearing concerning the
November 16 motion to dismiss on March 8, 2011.

The May 12, 2011 Bankruptcy Court Opinion found that many
of the allegations in the SAC concerning the value of CarCo's
Consideration were implausible, and that therefore the SAC did
not state a plausible claim that CarCo did not receive
reasonably equivalent value and fair consideration in the
Chrysler Reorganization and Sale.  Having found that the
allegations concerning CarCo's Consideration were implausible,
the Bankruptcy Court Opinion did not address the SAC's
allegations on insolvency.  Finally, recognizing that after
three complaints and access to Rule 2004 discovery the Trust had
failed to allege a constructive fraudulent conveyance claim
"beyond the merely speculative," the Bankruptcy Court dismissed
the fraudulent conveyance claims -- as well as the unjust
enrichment and alter ego claims, which relied on the fraudulent
conveyance allegations -- with prejudice.[5]  In re CarCo, 454 B.R.
at 60.

On July 21, the Trust filed this appeal from the Bankruptcy
Court Opinion.  The briefing on appeal was fully submitted on
September 30, 2011.

---

[5]    The Trust did not appeal the Bankruptcy Court's dismissal
of its alter ego claim.  Therefore, it is not discussed in this
Opinion.

DISCUSSION

I.   Standard of Review

     A.   Review of Bankruptcy Court Opinion

     The standard of review applicable to matters within core
bankruptcy jurisdiction is governed by the Federal Rules of
Bankruptcy Procedure.  On appeal, the court "may affirm, modify,
or reverse a bankruptcy judge's judgment, order, or decree or
remand with instructions for further proceedings."  Fed. R.
Bankr. P. 8013.

     "Findings of fact, whether based on oral or documentary
evidence, shall not be set aside unless clearly erroneous."
Id.; see Solow v. Kalikow (In re Kalikow), 602 F.3d 82, 91 (2d
Cir. 2010) (noting that "[f]indings of fact are reviewed for
clear error").  Although the Bankruptcy Court's findings of fact
"are not conclusive on appeal, the party that seeks to overturn
them bears a heavy burden," H & C Dev. Grp., Inc. v. Miner (In
re Miner), 229 B.R. 561, 565 (2d Cir. BAP 1999), and the
reviewing court must be "left with the definite and firm
conviction that a mistake has been made."  ASM Capital, LP v.
Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009).
Legal conclusions of the Bankruptcy Court, however, are
"reviewed de novo."  In re Kalikow, 602 F.3d at 91.  Finally,
mixed questions of law and fact are reviewed either "de novo or
under the clearly erroneous standard depending on whether the

13

question is predominantly legal or factual." Serv. Emps. Int'l,
Inc. v. Dir., Office of Workers Comp. Program, 595 F.3d 447, 455
(2d Cir. 2010) (citation omitted).

    B.   Standard of Review of a Motion to Dismiss

    When considering a motion to dismiss, a trial court must
"accept all allegations in the complaint as true and draw all
inferences in the non-moving party's favor." LaFaro v. New York
Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009). A
complaint must do more, however, than offer "naked assertions
devoid of further factual enhancement," and a court is not
"bound to accept as true a legal conclusion couched as a factual
allegation." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50
(2009). Accordingly, a court may disregard "threadbare recitals
of a cause of action's elements, supported by mere conclusory
statements." Id. at 1940.

    Furthermore, "a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'" Id. at 1949 (quoting Bell Atl. Corp.
v. Twombly, 550 U.S. 554, 570 (2007) (citation omitted)). If
the factual allegations "are merely consistent with a
defendant's liability, [the complaint] stops short of the line
between possibility and plausibility of entitlement to relief."
Id. (citation omitted).

    Applying this plausibility standard is "a context-specific

14

task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950. There must be a "reasonably founded hope that the discovery process will uncover relevant evidence." Twombly, 550 U.S. at 559, 563 n.8 (citation omitted). "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011).

In determining the adequacy of the complaint "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect. Id. (citation omitted). "Courts may also properly consider matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (citation omitted). "[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings

15

contained certain information, without regard to the truth of their contents" when assessing a motion to dismiss.  <u>Staehr v. Hartford Fin. Servs. Grp., Inc.</u>, 547 F.3d 406, 425 (2d Cir. 2008).  "[M]atters judicially noticed . . . are not considered matters outside the pleadings" requiring conversion of a motion to dismiss to one for summary judgment.  <u>Id.</u> at 426 (citation omitted).

C. The Bankruptcy Court Applied the Correct Standard of Review.

In its appeal, the Trust contends that the Bankruptcy Court improperly held the SAC to a higher standard of review because the Trust had the opportunity to engage in Rule 2004 discovery. This contention is meritless, as it is clear that the Bankruptcy Court Opinion applied the same standard for assessing the sufficiency of a complaint as that articulated above, relying heavily on the Supreme Court's recent clarification of this standard in <u>Twombly</u> and <u>Iqbal</u>.[6]  <u>In re Old CarCo</u>, 454 B.R. at 44-47.  Although the Bankruptcy Court did mention the Trust's Rule 2004 discovery, it did so only in the context of deciding to dismiss the Trust's claims with prejudice, and not with respect

---

[6]   The Trust's repeated exhortations, especially in its reply brief, that the guidelines of Fed. R. Civ. P. 8(a) should control any review of the SAC seem to urge that the more nuanced plausibility standard of <u>Twombly</u> and <u>Iqbal</u> need not be considered.  This Opinion declines to ignore this Supreme Court precedent.

to the sufficiency of these claims.[7]  Id. at 60.

II.  Constructive Fraudulent Conveyance Claims

The Trust argues that the Chrysler Reorganization and Sale constituted a constructive fraudulent conveyance under §§ 544, 548 and 550 of the Bankruptcy Code, 11 U.S.C §§ 544(b), 548(a)(1)(B), 550(a) and §§ 273, 274 and 275 of the New York Debtor and Creditor Law, N.Y. Debt. & Cred. Law, §§ 273-75 ("DCL").  "Under the avoidance provisions of the [Bankruptcy] Code, a transfer or obligation is or is deemed to be a fraudulent conveyance -- and therefore avoidable -- if the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation."  In re NextWave Personal Commc'ns, Inc., 200 F.3d 43, 56 (2d Cir. 1999) (citation omitted).  "[T]he question of reasonably equivalent value is determined by the value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged."  Id. (citation and emphasis omitted).  A finding that there was reasonably equivalent value does not require that the consideration exchanged be mathematically equal.  MFS/Sun Life Trust-High Yield Series v.

---

[7]    Furthermore, the fact that a plaintiff has already engaged in some discovery may be relevant in considering, as noted above, whether there is a "reasonably founded hope that the discovery process will uncover relevant evidence" if a complaint is not dismissed.  Twombly, 550 U.S. at 559, 563 n.8 (citation omitted).

Van Dusen Airport Servs. Co., 910 F. Supp. 913, 937 (S.D.N.Y. 1995).  A court should consider both direct and indirect benefits flowing to the debtor as a result of the exchange in determining if there was reasonably equivalent value.  Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 646-47 (3d Cir. 1991); Rubin v. Mfrs. Hanover Trust Co., 661 F.2d 979, 991-92 (2d Cir. 1981).

"Section 544(b) of the [Bankruptcy] Code allows the avoidance of any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law," such as the DCL.[8]  In re NextWave, 200 F.3d at 49.

> In analyzing a fraudulent conveyance claim . . . courts determine whether the debtor was engaged . . . in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the size of the transaction.  If so, and if the consideration provided by the debtor for the allegedly fraudulent transfer was not reasonably equivalent to what the debtor received in return on the effective date of the transfer, then the transfer is deemed constructively fraudulent and can be avoided.

Id.  Under the DCL, "a transfer made without fair consideration" is a constructive fraud "regardless of the intent of the transferor."  In re Sharp, 403 F.3d at 53 (citation omitted).

> [A] conveyance by a debtor is deemed constructively fraudulent if it is made without "fair consideration,"

---

[8]    The DCL is the New York Debtor and Creditor Law, which is New York's version of the Uniform Fraudulent Conveyance Act.  In re Sharp Int'l Corp., 403 F.3d 43, 53 (2d Cir. 2005).

and (<u>inter alia</u>) if one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

<u>Id.</u>

The Bankruptcy Court Opinion found the SAC implausibly alleged either a low value or no value for some of the consideration transferred to CarCo as part of the Chrysler Reorganization and Sale. In addition, it found that certain consideration transferred to CarCo as part of the Chrysler Reorganization and Sale carried value but was not mentioned at all in the SAC. By implausibly undervaluing, zero-valuing and not mentioning certain consideration, the Bankruptcy Court Opinion found that the Trust's claim that CarCo had not received fair consideration or reasonably equivalent value for those assets was implausible, and therefore that the Trust could not allege the first prong of a constructive fraudulent conveyance claim.

The Trust has limited its appeal to the portions of the Bankruptcy Court Opinion that found certain allegations in the SAC implausible. Daimler has not cross-appealed those portions of the Bankruptcy Court Opinion that did not find other allegations implausible and upon which the Bankruptcy Court did

not rely in dismissing the SAC -- the value of the tax
indemnification CarCo received from Daimler and the value of the
Auburn Hills Headquarters transferred from CarCo.  Also not at
issue in this appeal are (1) the Bankruptcy Court's decision, in
dismissing the FAC, that the different stages of the Chrysler
Reorganization and Sale constitute an integrated transaction,
and (2) the second, insolvency prong of the constructive
fraudulent conveyance claims.  Therefore, in reviewing the
Bankruptcy Court's dismissal of the constructive fraudulent
conveyance claim, this Opinion will review _de novo_ the SAC's
allegations and the Bankruptcy Court's findings with regard to
the value of Motors, the Credit Facilities, the Daimler Debt
Repayment, and the NSCs (collectively, the "Disputed
Consideration Elements").[9]

    With regard to most of the Disputed Consideration Elements,
the Bankruptcy Court correctly found that the SAC implausibly
undervalued them or that their omission made the SAC's assertion
that CarCo's Consideration was not fair consideration or
reasonably equivalent value for the Transferred Assets
implausible on its face.  The Bankruptcy Court's findings are
not subject to reversal merely because it did not ascribe
specific values to each Disputed Consideration Element; in fact,

---

[9]    The Bankruptcy Court made findings as well as to two other
components of the Disputed Consideration Elements which, for
reasons explained below, need not be considered here.

doing so would have been fact finding -- impermissible at the motion to dismiss stage.[10]   Rather, the Bankruptcy Court's dismissal of the fraudulent conveyance claim appropriately rests on the finding that these Disputed Consideration Elements, in combination, were so implausibly undervalued, zero-valued, and omitted that the allegations in the SAC, as a whole, cannot support a finding that CarCo suffered a Consideration Gap as a result of the Chrysler Reorganization and Sale.

A.   Valuation of Motors

Unlike in the FAC, where the Trust alleged that the equity of Motors transferred to CarCo had no value, the Trust alleged in the SAC that it was worth no more than $450 million.  This allegation rests on several assumptions.  First, the Trust assumes that Motors's valuation at $5.5 billion is based entirely on the income stream it would receive under the SDA. If Motors and CarCo were separate, unrelated companies (these hypothetical companies being referred to as "Independent CarCo" and "Independent Motors"), the Trust assumes that Independent CarCo would immediately cancel the SDA.  Due to the six-month

---

[10]   The Trust cites several times to <u>Rubin</u> in its reply brief to imply that the Bankruptcy Court's dismissal of its claims should be reversed because it did not determine a precise value that the Disputed Consideration Elements conveyed to CarCo to close the Consideration Gap.  But <u>Rubin</u> involves a case that proceeded through a bench trial, and the issue on appeal was not the implausibility of the complaint but rather the sufficiency of the evidence presented by the plaintiff.  <u>Rubin</u>, 661 F.2d at 981, 987-88.

notice period required under the SDA, Independent Motors would generate income under the SDA no greater than $430 million -- income which, with the companies independent, would continue to reside at Independent Motors and not accrue to Independent CarCo's benefit.  The allegations also rely on the assumption that in order to replicate the tax benefits of having its sales and distribution functions in a separate entity, Independent CarCo could create a new subsidiary to take on those functions at an expense of no more than $20 million.  Therefore, the Trust alleged that the value to CarCo in acquiring Motors as a subsidiary instead of engaging in these steps would amount to no more than $450 million.

This is an implausible value for Motors because the chief assumption upon which this value rests -- that there is a 100% chance that Independent CarCo would immediately cancel the SDA -- is itself implausible because of the $11.6 billion intercompany debt that CarCo owed to Motors.  The SDA explicitly stated that its termination "will not release either party from any outstanding obligation accruing prior to the termination, including without limitation, payment of any monies."

Independent Motors, acting in its own self-interest and free from needing to consider any detrimental effects to Independent CarCo, would undoubtedly either collect this receivable, use it as leverage to prevent the cancellation of

the SDA, or, if required, seek to enforce it through litigation. If it succeeded in collecting on the debt, this would be a cost of $11.6 billion for CarCo, which it could otherwise avoid by continuing the SDA. Even if the enforceability of the debt were questioned, Independent Motors would have the option of offsetting a portion of the debt, by selling its estimated $1 billion in inventory, the proceeds of which it otherwise would be obligated to turn over to Independent CarCo. Thus, under this scenario, cancellation of the SDA would exact a much higher cost, approaching another $1 billion unaccounted for by the SAC. The costs of any litigation and the contingent costs of losing such litigation -- together exceeding $11.6 billion -- would be other costs to cancelling the SDA that would otherwise be avoided.

The Trust's assumption, which considers none of these costs to an Independent CarCo if it chose to cancel the SDA, is implausible. It relies on the wholly unrealistic hope that an Independent Motors would not seek the options that would either persuade Independent CarCo not to cancel the SDA or that would capture as much value as possible for its shareholders and creditors. The sizeable penalty that Independent CarCo would face severely undermines any likelihood that it would seek to cancel the SDA, especially considering the likelihood that such penalty could exceed the $5.5 billion income Independent CarCo

would purportedly recapture by cancelling the SDA.

It is therefore implausible to suggest, as the Trust does, that there would be a 100% chance that Independent CarCo would cancel the SDA.  The Trust, having chosen to allege in the SDA that the value of Motors should be drastically discounted based on a contingency that Independent CarCo would choose to cancel the SDA, must confront, for its valuation to be plausible, that there is a significant likelihood that the costs associated with cancellation would cause Independent CarCo to refrain from cancelling the SDA.[11]  As it stands, the SAC fails to allege with plausibility that the value of the equity of Motors transferred to CarCo is no more than $450 million.

The Trust does not deny that an $11.6 billion receivable existed on the books of both CarCo and Motors, but argues that it should not be factored into the valuation of Motors because it was either not enforceable or would not be enforced by an Independent Motors.  It is worth underscoring that the Trust was correct to recognize that in valuing Motors, it had to consider what CarCo gained from the Chrysler Reorganization and Sale rather than having its corporate relationship with Motors

---

[11]    The value of a contingent asset, like a contingent liability, should be assessed "in light of the probability that they will be realized."  In re Hall, 304 F.3d 743, 748 (7th Cir. 2002).  The Trust's allegation that there is a 100% probability that Independent Motors would be immediately deprived of its value through a cancellation of the SDA is not plausible.

severed, as this illuminates how an Independent CarCo might value control of Motors if it were not forced to acquire it by a common controlling entity.[12]   But, the Trust's arguments that the receivable was unenforceable or would not be enforced fail because they do not consistently apply this scenario.

First, the Trust argues that because CarCo was insolvent and the receivable was an unsecured debt supported by no documentation, no rational person could believe that it would be enforceable.  This argument presupposes, without support, that CarCo was insolvent during the entire period when this debt to Motors was incurred.  Furthermore, this argument assumes, illogically, that Independent Motors, or its third-party corporate parent, would not seek to reduce this receivable, owed by CarCo to Motors, to a documented contractual obligation at the time Motors was being separated from CarCo.  Considering the great value this receivable would have to Independent Motors, it would be in Independent Motors's best interest to formalize this obligation upon separation from CarCo.  In fact, it is implausible that Independent Motors would not seek to formalize

---

[12]   "Fair market value" is defined as the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction."  Black's Law Dictionary (9th ed. 2009).

this obligation at the outset of its separation.[13]

Second, the Trust argues that the $11.6 billion receivable
should not be factored into its assumptions for the value of
Motors because Houlihan Lokey "assigned it a $0 value" and had
"apparent skepticism" about its enforceability.  But on the face
of its analysis, Houlihan Lokey states that it "did not
consider" the receivable which had a "book value of
approximately $11.6 billion."  It did not state that it found
the receivable had no value.  As significantly, the purpose of
Houlihan Lokey's analysis was to determine what the value of
Motors to CarCo would be <u>as its subsidiary</u>.[14]  Thus, Houlihan

---

[13]   In opposing the motion to dismiss below, the Trust
attempted to introduce a supplemental declaration from an expert
that would show the intercompany receivable was not secured, had
no terms of repayment and no payment was ever made from CarCo to
Motors specifically for the purpose of paying down this
receivable.  The Trust also argued that it "confirmed in
interviews with knowledgeable witnesses after briefing" that the
receivable was merely an accounting entry never intended to be
enforced.  Neither the supplemental declaration nor these
interviews are properly considered here on appeal, nor were they
properly before the Bankruptcy Court.  But even if they were,
these would only show how this receivable was treated between
Motors and CarCo as related companies -- with one the direct
parent of the other -- and is not persuasive evidence that
Motors would simply walk away from a huge receivable upon
becoming independent or upon notification that CarCo intended to
cancel the SDA.

[14]   Daimler does not argue that the $11.6 billion receivable
should have been added to Motors's value in Houlihan Lokey's
analysis, making it worth more than $16 billion.  And it
certainly would not make sense to do so, as CarCo would gain no
value from the fact that its subsidiary was entitled to a
repayment of debt from CarCo itself.

Lokey's analysis has no bearing on whether or not Independent Motors, set free from any corporate relationship with Independent CarCo, would seek to enforce this obligation against Independent CarCo when confronted with the threat of the cancellation of the SDA. The analysis performed by Houlihan Lokey, therefore, provides no support for the Trust's argument that this large debt would have no bearing on Independent CarCo's decision to enforce the SDA.

Finally, the Trust argues that the Bankruptcy Court's finding that the $11.6 billion debt was enforceable impermissibly referred to evidence outside the complaint of which it should not have taken judicial notice. The Bankruptcy Court Opinion noted that in bankruptcy filings by Motors and CarCo, each company included this debt on its financial statements -- as a liability for CarCo, and as an asset for Motors. These 2009 filings indicated that this debt had been reduced by $2 billion since the 2007 Chrysler Reorganization and Sale. Although the Bankruptcy Court was careful not to take these filings as evidence for the truth of the existence or the precise amount of this debt, it found it significant that Motors and CarCo had noted a change in the amount of this debt, as it suggested that these companies considered it to be of real economic value.

The Bankruptcy Court, like any court, can "take judicial

notice of the fact that . . . prior lawsuits . . . contained certain information, without regard to the truth of their contents" when assessing a motion to dismiss.  Staehr, 547 F.3d at 425.  In particular, it is appropriate to take judicial notice of filings in bankruptcy proceedings.  See, e.g., In re F.C.C., 208 F.3d 137, 138 (2d Cir. 2000); Sure-Snap Corp. v. State St. Bank & Trust Co., 948 F.2d 869, 872 (2d Cir. 1991).

To the extent that the Bankruptcy Court's Opinion may have strayed from merely noting that CarCo and Motors indicated there was a change in the stated value of the receivable and instead found that the value of the receivable actually did change, this might constitute an impermissible reliance on the filings for the truth of the matters asserted in them.  But it is far from clear from the Bankruptcy Court Opinion that CarCo and Motor's bankruptcy filings were used in this manner.

Regardless, this Court may affirm the Bankruptcy Court's findings as to the $11.6 billion debt on the grounds described above, none of which rely on CarCo and Motors's bankruptcy filings.  What matters for the valuation of CarCo's acquisition of Motors is not how CarCo and Motors, as related companies, may have treated the intercompany debt, but how the debt might have been used by Independent Motors when confronted by an

Independent CarCo's hypothetical effort to cancel the SDA.[15]
When considered in this light, it is implausible to allege that
the receivable was without value and that the equity of Motors
when transferred to CarCo amounted to no more than $450 million.

    B.   Valuation of Credit Facilities

    The Trust, in describing the $12 billion Credit Facilities
advanced to CarCo as part of the Chrysler Reorganization and
Sale, alleged that these conveyed zero net value or
consideration.  The bases for this allegation are that the
Credit Facilities were not intended for new investment, business
opportunities, or expansion and that they carried with them
costs of borrowing.  In the alternative, the Trust alleged that
even if the Credit Facilities conveyed some additional value,
this value would not be sufficient to close the $1.695 billion

---

[15]    The Bankruptcy Court also found that the SAC's assumption
that Independent CarCo could incorporate a new subsidiary at a
cost of no more than $20 million was implausible.  It determined
that Motors conducted its operations using assets worth several
billion dollars that would need to be replicated by a new
subsidiary.  Furthermore, the reconstruction of Motors's
distribution network -- a network which had resided in a
separate entity from the Chrysler manufacturing entity for
decades, see Crawford Transp. Co. v. Chrysler Corp., 338 F.2d
934, 936 (6th Cir. 1964) -- would be very costly.  The Trust
appealed this finding, arguing that it relied too much on fact-
finding impermissible at this motion to dismiss stage, and that
it ignored facts such as the liabilities that burdened Motors's
assets and that Motors's dealer contracts would revert to CarCo
upon the cancellation of the SDA.  Because this Opinion has
already found the Trust's allegations as to Motors's low value
to be implausible, this alternative basis for the Bankruptcy
Court's findings on this issue need not be addressed.

Consideration Gap.

"The ability to borrow money has considerable value in the commercial world.  To quantify that value, however, is difficult.  Quantification depends upon the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business."  Mellon Bank, 945 F.2d at 647.  Despite these difficulties, the value provided by loans must be considered in any analysis of whether a debtor received reasonably equivalent value in a suspect transaction.  Id. at 648.  Such value need not be direct, tangible, or easily quantifiable in order to be considered part of the fair consideration received by a debtor.  In re R.M.L., Inc., 92 F.3d 139, 151 (3d Cir. 1996).

An allegation that the Credit Facilities conveyed no net value above the costs of borrowing to CarCo is implausible. Even if, as the Trust alleges, the large increase in capital the Credit Facilities afforded to CarCo was not used for new business opportunities, it would have provided tangible value to CarCo, such as having cash on hand and capital flexibility, as well as the intangible benefits that flow from greater access to capital.[16]  This increased access to capital was especially

---

[16]    The Bankruptcy Court cited a facilitation of negotiations with the United Auto Workers ("UAW") as one benefit that flowed

30

valuable at the time of the Chrysler Reorganization and Sale, a period characterized by a credit freeze and higher costs of borrowing in the United States.  Therefore it is implausible that the Credit Facilities provided no net benefit to CarCo.

The Trust argues that the Credit Facilities should be valued based on a calculation of their market cost, that this cost was the amount that CarCo incurred to carry these loans, and that therefore the Credit Facilities conveyed no net benefit to CarCo.  The Trust does not cite any case law in support of this assertion, nor does it explain why the case law finding that access to capital conveys important value to a borrowing company should be ignored in this case -- especially when the capital provided by the Credit Facilities amounted to $12 billion and was extended at a time when companies in the United States were facing a credit freeze.  It may be that the tangible benefits of a loan are generally matched by the costs incurred in taking out the loan, but the Trust's suggestion that access to credit routinely carries no net intangible benefit strains credulity, as it would suggest that the regular borrowing activity of companies -- "the lifeblood of the commercial

from CarCo's access to capital through the Credit Facilities. The Trust challenges this as a finding of fact improper at this motion to dismiss stage.  This Opinion need not decide whether the Credit Facilities' effect on the UAW negotiations was properly before the Bankruptcy Court because the Credit Facilities, as a matter of law, provided a net benefit to CarCo regardless of their effect on these negotiations.

world," Mellon Bank, 945 F.2d at 648 -- is done for no good
reason, the borrowers receiving no tangible or intangible
benefit from their loans.

     The Trust also argues that in order for any benefit from
the Credit Facilities to be considered, their value must be
quantified, concrete and realizable.  In support of this
argument, the Trust cites to two cases which held that "indirect
benefits" should not be recognized in evaluating a fraudulent
conveyance claim unless they are "concrete" or "realizable."  In
one of these cases, Mellon Bank, the court nonetheless found
intangible benefits from access to credit was indeed a
realizable benefit that conveyed value to a debtor and which
should be considered in assessing fair consideration.  Id. at
647-48.  The Trust also cited language in Mellon Bank that "the
value of obtaining the credit [is] difficult to quantify in
dollars without the aid of expert witnesses," id. at 648, and so
concluded that the value of the Credit Facilities was not
properly adjudicated on a motion to dismiss.  But the fact that
the exact value cannot be quantified at this stage does not
prevent a finding that the allegation that the Credit Facility
has no net value or little value is implausible.

     In the other case upon which the Trust relies in its
appellate brief, the "indirect benefits" discussed were
transfers to a third party, which could potentially benefit a

debtor that had extended an intercorporate guarantee to the
third party.  In re Image Worldwide, Ltd., 139 F.3d 574, 578-79
(7th Cir. 1998).  Because of the potential abuses in such
relationships, which the Image Worldwide panel explained in
detail, such transfers could be recognized as indirect benefits
only if they were "fairly concrete."  Id. at 578.  In the
absence of transfers to third parties, Image Worldwide is
inapposite to the claims the Trust has alleged here.[17]

Finally, the Trust alleged, in the alternative, that even
if the Credit Facilities had some net value to CarCo, this value
would not be sufficient to close the $1.695 billion
Consideration Gap.[18]  This alternative allegation, standing
alone, cannot be said to be implausible in light of the
difficulty in valuing the intangible benefits CarCo derived from
the Credit Facilities.  But in the context of all the
allegations in the SAC, and this Opinion's findings that other

---

[17]   The cases cited in the Trust's reply on appeal are
similarly inapposite, as they considered indirect benefits that
were contingent, with a slim chance that they would even occur -
- unlike the Credit Facilities, which the Trust does not contest
were actually extended to CarCo in the Chrysler Reorganization
and Sale.  See In re Southern Health Care of Arkansas, Inc., 309
B.R. 314, 319-20 (8th Cir. BAP 2004); In re Nirvana Restaurant,
Inc., 337 B.R. 495, 503-04 (Bankr. S.D.N.Y. 2006).

[18]   The Trust contends that the Bankruptcy Court ignored this
alternative allegation.  Although the Bankruptcy Court did
acknowledge it, In re Old CarCo, 454 B.R. at 56, the Bankruptcy
Court Opinion did not actually discuss the effect of that
allegation on the plausibility of the SAC.

allegations in the SAC are implausible, the fact that the Credit
Facilities, alone, may not have conveyed sufficient value to
close the Consideration Gap does not justify reversing the
Bankruptcy Court Opinion.  It remains implausible for the Trust
to allege that the value conveyed by the $12 billion Credit
Facilities, along with the value conveyed by the other Disputed
Consideration Elements which the Trust undervalued or omitted,
was not, at the very least, reasonably equivalent to the $1.695
billion Consideration Gap.[19]

C.   Disputed Consideration Elements Not Mentioned in the
     SAC

The Bankruptcy Court found that the Trust had omitted from
the SAC three additional Disputed Consideration Elements that
CarCo received in the Chrysler Reorganization and Sale and

---

[19]   The Trust cites MFS/Sun Life Trust-High Yield Series v. Van
Dusen Airport Services Co., 910 F. Supp. 913 (S.D.N.Y. 1995), to
support its argument that a finding that the Credit Facilities
conveyed reasonably equivalent value would be "speculation."
Id. at 938.  But the differences between MFS/Sun Life and the
present case, demonstrate why the opposite finding -- that it is
implausible to conclude that CarCo's Consideration, combined
with the Disputed Consideration Elements failed to convey
reasonably equivalent value and fair consideration -- is
appropriate here.  In MFS/Sun Life, the only elements of
consideration the debtor received were favorable tax benefits
from asset write-downs and access to a $10 million dollar credit
line.  There was no mathematical way that these elements could
be fair consideration for the $26 million in assets transferred
away from the debtor in the subject transaction.  Id.  In
contrast, here the Consideration Gap is a small fraction of the
potential value of the undervalued and omitted Disputed
Consideration Elements.

which, if added to the other elements of CarCo's Consideration, would contribute to closing the Consideration Gap.  The Trust argues that even if these Disputed Consideration Elements did convey some value to CarCo, it would not be sufficient to make a material impact on the $1.695 billion Consideration Gap. Although the Bankruptcy Court did not quantify how much value each of these three Disputed Consideration Elements might have contributed to CarCo, their omission, along with the undervaluation of the other Disputed Consideration Elements described above -- the $12 billion Credit Facilities and the $5.5 billion valuation of Motors's equity -- renders implausible the SAC's claim that CarCo did not receive fair consideration in the Chrysler Reorganization and Sale because of a Consideration Gap of $1.695 billion.

> 1.   Daimler Debt Repayment

The first Disputed Consideration Element that the Trust did not mention in the SAC was the Daimler Debt Repayment -- Daimler's repayment to CarCo of a preexisting $920 million intercompany debt.  The Bankruptcy Court specifically referred to this Disputed Consideration Element in its opinion dismissing the FAC, instructing the Trust to include it in any allegations about CarCo's Consideration in the SAC.  Although, as the Trust argues, the Daimler Debt Repayment was balance sheet neutral because it merely replaced one form of asset (a receivable) with

another (cash), the infusion of cash, like the infusion of cash
that accompanied the extension of the Credit Facilities,
provided real value to CarCo.  In its appellate brief, the Trust
concedes that "the availability of cash . . . arguably would
confer some additional benefit on the payee."

The Trust's only argument against considering the value
from the $920 million Daimler Debt Repayment as part of CarCo's
Consideration is that it should be balanced against CarCo's
repayment of an alleged $1.946 billion debt to Daimler at the
same time, which, although similarly balance sheet neutral,
drained cash away from CarCo.  But this argument ignores the
fact that the intercompany debt that CarCo repaid Daimler was a
short-term bridge loan (the "Daimler Bridge Loan"), the
extension and repayment of which were both included in the
Contribution Agreement.  Therefore, CarCo's repayment of the
Daimler Bridge Loan is set off in the Chrysler Reorganization
and Sale by Daimler's initial extension of the Daimler Bridge
Loan because that short-term cash infusion was both provided for
and repaid as part of the integrated transaction.  There is no
basis for the Trust's argument that the value of the Daimler
Debt Repayment should be cancelled by CarCo's repayment of the
Daimler Bridge Loan, and therefore no reason why its omission
from the SAC should not be found to undermine the plausibility

of the Trust's fraudulent conveyance claim.[20]

     2.   NSCs

The second Disputed Consideration Element that the Trust did not mention in the SAC was the conveyance of the NSCs by Daimler to CarCo to provide it with overseas distribution facilities, along with the NSCs' substantial inventory of vehicles. The Trust argues that the NSCs were of minimal additional value to CarCo because prior to the Chrysler Reorganization and Sale, the NSCs were already obligated to pay most of the proceeds from the sale of their inventory to CarCo. In addition, the Trust argues that the transfer of the NSCs made CarCo liable for these companies' outstanding liabilities, undermining their net value to CarCo. Finally, the Trust cites to an opinion of Deloitte & Touche which valued the NSCs at only $47 million.

These assertions, had they been made in the SAC, do not demonstrate that the conveyance of the NSCs provided no net value to CarCo in the Chrysler Reorganization and Sale. Although the Trust argues that the NSCs had only a _de minimis_

---

[20]   The Trust contends that the issue of whether the Daimler Debt Repayment should be offset by the Bridge Loan is a factual issue inappropriate for resolution at this stage. This argument is meritless because the fact that the Bridge Loan was extended and repaid, and that the flow of cash as a result of these transactions offset each other, is evident on the face of the Contribution Agreement, upon which the SAC relies and which on appeal the Trust does not contest was properly before the Bankruptcy Court in deciding Daimler's motion to dismiss.

value in the context of the whole transaction, its failure to mention the NSCs in the SAC further undermines the plausibility of its allegation that CarCo did not receive fair consideration and reasonably equivalent value.[21]

    D.    Implausibility of the Trust's Alleged Consideration Gap

As described above, the SAC undervalued Motors, and therefore, CarCo's Consideration in the Chrysler Reorganization and Sale, by making implausible assumptions about how an Independent CarCo would value the acquisition of an Independent Motors.  Although the amount of this undervaluation is not quantifiable based on the SAC's implausible pleadings, it could be as much as $5.05 billion.  It then failed to attribute any value to the availability of credit provided by the $12 billion Credit Facilities, ignoring both case law explaining that a cash infusion carries value to the borrower as well as the circumstances in this case that would make such a large loan

---

[21]    The Trust also challenges the Bankruptcy Court's findings regarding two other Disputed Consideration Elements.  The Bankruptcy Court found that it was implausible for the Trust to ascribe the Ancillary Agreements between Daimler and CarCo zero value.  Similarly, the Bankruptcy Court noted that the SAC's omission of the Daimler Pension Guarantee further undermined the Trust's allegation that the Chrysler Reorganization and Sale resulted in a Consideration Gap.  The Bankruptcy Court's conclusions as to the remaining Disputed Consideration Elements -- the equity of Motors, Credit Facilities, Daimler Debt Repayment and NSCs -- are sufficient, alone, for this Opinion to affirm to Bankruptcy Court's decision to dismiss the SAC.  Therefore, the Trust's arguments regarding these remaining Disputed Consideration Elements need not be considered here.

very valuable to CarCo.  The SAC failed to mention the $920
million Daimler Debt Repayment which also supplied cash on hand
to CarCo despite the Trust's concession in its briefs that the
availability of cash would be a benefit.  This omission followed
the Bankruptcy Court's specific instructions in dismissing the
FAC that the SAC would need to allege the value of this debt
repayment in order to make a plausible case that CarCo failed to
receive fair consideration.  Finally, the SAC also ignored the
conveyance to CarCo of the NSCs, which, if looking only to the
SAC and the documents integrated with it, appear to retain
significant value.

     The Trust's fall-back position is to allege that even if
its allegations as to any one of these Disputed Consideration
Elements was implausible, any additional value from that element
would still not be sufficient to close the $1.695 billion
Consideration Gap alleged in the SAC.  This argument fails
because the extent of the SAC's implausible undervaluations and
omissions are such that, once no longer credited, it is
implausible to see, on the face of the SAC, any Consideration
Gap.  This is not to say that the Trust's remaining allegations
could not state a _possible_ constructive fraudulent conveyance
claim, but without plausible allegations about the valuation of
major elements of CarCo's Consideration, it does not state a
_plausible_ claim.  See _Iqbal_, 129 S. Ct. at 1949.  Therefore,

even though this Opinion does not reach the Bankruptcy Court's
conclusions as to the implausibility of the Trust's allegations
concerning the Ancillary Agreements and the Daimler Pension
Guarantee, the Bankruptcy Court's main holding -- that the SAC's
undervaluation and omission of various Disputed Consideration
Elements renders the Trust's claim that CarCo suffered from a
$1.695 billion Consideration Gap in the Chrysler Reorganization
and Sale -- is affirmed, and the constructive fraudulent
conveyance claims are dismissed.[22]

III. Unjust Enrichment Claim

     The Bankruptcy Court Opinion dismissed the Trust's unjust
enrichment claim because it relied on the allegation that CarCo
did not receive fair consideration in the Chrysler
Reorganization and Sale.  The Trust does not argue that these
claims can survive the dismissal of the constructive fraudulent
conveyance claims.  The Bankruptcy Court's holding that the
unjust enrichment claims must be dismissed is therefore also

---

[22]     The Bankruptcy Court also remarked that the SAC ignored the
numerous sophisticated entities which participated in the
Chrysler Reorganization and Sale in possession of
contemporaneous market information.  The participation of these
self-interested and independent entities, the Bankruptcy Court
reasoned, underlined the implausibility of the Trust's
allegations.  In its brief opposing this appeal, Daimler
emphasized this factor even more than did the Bankruptcy Court.
Because the Trust's allegations are implausible on their face,
without reference to the participation of third parties in the
Chrysler Reorganization and Sale, it is not necessary to rely on
this ground in affirming the Bankruptcy Court Opinion.

affirmed.

IV.  Dismissal with Prejudice

A "court's denial of leave to amend" is reviewed "for abuse of discretion."  Williams v. Citigroup Inc., 659 F.3d 208, 212 (2d Cir. 2011) (per curiam) (citation omitted).  Although, "in the ordinary course . . . courts should freely give leave to amend a complaint when justice so requires," leave may be denied when there has been "repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  Id. at 213-14 (citation omitted).  It is therefore not an abuse of discretion to deny a plaintiff leave to amend its complaint after the plaintiff has already been given several opportunities to amend and/or has had ample access to discovery before repleading, putting into question whether another opportunity would find any more success.  Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 480 (4th Cir. 2006); De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 71-72 (2d Cir. 1996).

The Bankruptcy Court dismissed the Trust's claims with prejudice.  It reasoned that the Trust had been given access to substantial Rule 2004 discovery and the opportunity to plead its claims in three different complaints, and that nonetheless the Trust had still been unable to assert plausible claims.  On appeal, the Trust does not suggest how it could cure the

41

deficiencies in the SAC, and merely suggests that it should be permitted to take further discovery. The Bankruptcy Court therefore correctly based its denial of leave to amend on the Trust's repeated failure to cure deficiencies in its complaint and its conclusion that further amendment would be futile considering how much discovery had already taken place. This Court finds, in addition, that the defendants would suffer undue prejudice by virtue of having to defend yet another amended complaint.


CONCLUSION

The May 12, 2011 Bankruptcy Court Opinion is affirmed. The appeal is dismissed, and the Clerk of Court shall close the case.


Dated:     New York, New York
           November 22, 2011

                                    _____
                                    DENISE COTE
                                    United States District Judge